# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 18-0140V
Filed: September 6, 2019
UNPUBLISHED

| | |
|---|---|
| CYNTHIA NUTE,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*Maximillian J. Muller*, Muller Brazil, LLP, Dresher, PA, for petitioner.
*Christine Mary Becer*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On January 30, 2018, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza vaccination received on September 21, 2016. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons described below, the undersigned finds that petitioner is entitled to an award of damages in the amount **$125,000.00**, **representing compensation for actual pain and suffering.**

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this unpublished decision contains a reasoned explanation for the action in this case, undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I. Relevant Procedural History

On January 30, 2018, petitioner filed her petition along with medical records (ECF No. 1). Petitioner filed additional medical records on February 20, 2018 (ECF No. 11) and March 14, 2018 (ECF No. 12) and filed a Statement of Completion on March 14, 2018 (ECF No. 13). Petitioner filed additional records on July 10, 2018 (ECF No. 15). On February 26, 2019, respondent filed his Rule 4(c) report conceding that petitioner was entitled to compensation (ECF No. 30). On February 27, 2019, the undersigned issued a ruling on entitlement (ECF No. 31) and a damages order (ECF No. 32). The parties then commenced damages discussions.

On March 15, 2019, petitioner filed a status report stating that the parties were unable to reach agreement concerning damages (ECF No. 33). On May 16, 2019, petitioner filed a joint status report confirming that the evidentiary record was complete, indicating that the only damages sought and disputed were for pain and suffering, that there was not a request for damages for out of pocket medical expenses, and there was not a Medicaid lien (ECF No. 36). The parties requested that the undersigned enter a decision on damages based on damages briefs. *Id.* The parties were directed to file damages briefs (ECF No. 38). On July 8, 2019, petitioner filed her damages brief (ECF No. 40). Respondent filed his brief on damages on August 7, 2019 (ECF No. 41). The matter is now ripe for adjudication.

## II. Relevant Medical History

On September 21, 2016, petitioner, then a 43 year old nurse, received an influenza vaccination in her left deltoid. Petitioner's Exhibit ("Pet. Ex.") 10 at 2; 2 at 4.

On October 28, 2016, petitioner presented to Dr. William Frisella for evaluation of her left shoulder. Pet. Ex. 2 at 1. Petitioner stated that she did not have pain prior to September 21, 2016. *Id.* Petitioner reported that she received a flu vaccine injection on September 21, 2016 and had pain at the time of injection that persisted and increased, along with loss of motion. *Id.* On exam, Dr. Frisella found petitioner's range of motion to be limited, with pain at the extremes of motion. *Id.* He assessed her with bursitis related to a flu vaccine injection and noted a slight element of adhesive capsulitis. *Id.* He recommended a series of three cortisone injections divided between the subacromial space and the glenohumeral joint. *Id.*

On November 9, 2016, petitioner returned to Dr. Frisella for a follow up and reported continued pain. Pet. Ex. 2 at 6. Dr. Frisella administered cortisone injections in the subacromial space and glenohumeral joint and directed petitioner to return in a week for another series of injections. *Id.*

On November 15, 2016, petitioner returned to Dr. Frisella. Pet. Ex. 2 at 9. She reported that the prior injection made her shoulder worse and resulted in significantly increased pain. *Id.* On examination, Dr. Frisella found that petitioner's left shoulder external rotation had decreased from 60 to 30 and noted that it "looks a lot more like

adhesive capsulitis." *Id.* He assessed her with left shoulder inflammation and probable adhesive capsulitis related to vaccine administration. *Id.* Petitioner "was very reluctant to consider a 2nd injection." *Id.* Dr. Frisella explained that he "did not have much else to offer her besides injections and/or physical therapy." *Id.* Petitioner decided to proceed with the injections and Dr. Frisella administered a cortisone injection into petitioner's left glenohumeral joint. *Id.* Petitioner was directed not to work for two days "[s]ince she had so much pain last time." *Id.*

On November 30, 2016, petitioner returned to Dr. Frisella for a follow up. Pet. Ex. 2 at 12. She reported that the last injection had helped her "quite a bit." *Id.* On examination, he noted again that it "looks a lot more like adhesive capsulitis." *Id.* Dr. Frisella administered a cortisone injection into petitioner's left glenohumeral joint and directed petitioner to return in two weeks. *Id.*

On December 16, 2016, petitioner returned to Dr. Frisella reporting significant improvement but remaining stiffness. Pet. Ex. 2 at 15. Dr. Frisella assessed her with "[l]eft shoulder adhesive capsulitis, related to vaccine administration." *Id.* He explained to her that adhesive capsulitis "can take months or even up to a year to resolve." *Id.* Petitioner was instructed to return in four weeks.

On January 17, 2017, petitioner returned to Dr. Frisella reporting excellent pain relief but continuing loss of motion. Pet. Ex. 2 at 18. On examination, Dr. Frisella found that "she still has a fairly significant loss of motion." *Id.* Dr. Frisella recommended "watchful waiting" and noted that if petitioner had a recurrence of pain or the stiffness persisted and became intolerable, surgery remained a possibility. *Id.* Petitioner asked about physical therapy but Dr. Frisella recommended against it at that time. *Id.*

On February 28, 2017, petitioner followed up with Dr. Frisella. Pet. Ex. 2 at 21. She reported no complaints of pain but that she was still experiencing loss of motion. *Id.* Dr. Frisella found petitioner's exam "a bit difficult to interpret." *Id.* He noted that her external rotation range of motion actively was only ten degrees but passively was 60 degrees.[3] *Id.*

On April 14, 2017, petitioner returned to Dr. Frisella. Pet. Ex. 2 at 24. She reported that over the prior four to six weeks she had experienced increasing pain in her left shoulder and that she felt her condition was returning to where it was previously. On examination, she had limited external rotation and internal rotation and positive impingement signs. *Id.* Dr. Frisella ordered a left shoulder MRI to rule out a rotator cuff tear. *Id.* He noted that regardless of the MRI results, she "certainly has clinical worsening and a decompression procedure may be beneficial." *Id.* He instructed her to

---

[3] In general, shoulder external rotation for adults varies from about 90 to 100 degrees. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 88 (F. A. Davis Co., 5th ed. 2016). Active range of motion "is the arc of motion produced by the individual's voluntary unassisted muscle contraction," while passive range of motion "is the arc of motion produced by the application of an external force by the examiner." *Id.* at 8. Normally, "passive ROM is slightly greater than active ROM because each joint has a small amount of motion that is not under voluntary control." *Id.*

3

return after the MRI and noted that he would probably recommend surgery at that visit. *Id.*

On April 26, 2017, an MRI of petitioner's left shoulder was performed. Pet. Ex. 3 at 743. The MRI was interpreted as normal. *Id.*

On May 5, 2017, petitioner returned to Dr. Frisella complaining of significant shoulder pain. Pet. Ex. 2 at 27. He noted that her MRI was normal and on that basis considered it reasonable to continue with a conservative approach. *Id.* However, because clinically her condition was worsening, he determined that he would wait a few more weeks to see if she started to improve and, if not, proceed with debridement. *Id.*

On May 12, 2017, petitioner returned to Dr. Frisella reporting worsening pain. Pet. Ex. 2 at 30. On examination, he found that she had "obvious and severe adhesive capsulitis." *Id.* He assessed her with vaccine-related adhesive capsulitis. *Id.* He opined that "the prevailing factor causing her condition is her work injury. I believe that the injection caused the onset of inflammation that developed into frank adhesive capsulitis which is confirmed objectively on exam today." *Id.* He recommended manipulation and subacromial decompression. *Id.*

On June 15, 2017, petitioner underwent left shoulder surgery performed by Dr. Frisella. Pet. Ex. 2 at 42-43. He performed a left open biceps tenodesis, extensive glenohumeral debridement, and subacromial decompression. *Id.* at 42. He found "significant bursitis" during surgery and noted that "[t]his appeared to be the primary problem." *Id.* at 43. He found "no evidence of adhesive capsulitis." *Id.* He made a 2 cm incision in order to perform the biceps tenodesis. *Id.* His postoperative plan was for petitioner to attend "aggressive daily physical therapy" beginning the day after surgery in order to minimize stiffness. *Id.* at 42.

On June 16, 2017, the day after her shoulder surgery, petitioner reported to SSM Health for an initial physical therapy evaluation. Pet. Ex. 11 at 170. She reported that "she got a flu shot in September and then her shoulder froze up on her" and that she had undergone surgery on June 15, 2017. She reported "moderate amounts of pain, limitations with shoulder and elbow ROM [range of motion]." *Id.* On examination, her passive range of motion in flexion was 105 degrees on the left (compared to 150 degrees on the right) and external rotation was 45 degrees on the left (compared to 82 degrees on the right). *Id.* The plan was for her to engage in skilled physical therapy five times a week until her post-operative appointment with her physician and thereafter as prescribed. *Id.*

On June 19, 2017, petitioner reported for physical therapy with a pain level ranging from 5-8 out of 10. Pet. Ex. 2 at 173. Her passive range of motion in flexion and external rotation of her left shoulder at this appointment had improved to the point where it was nearly the same as her right shoulder.[4]

---

[4] Her left shoulder *passive* range of motion in flexion was 155 degrees and in external rotation 85 degrees. Her *active* range of motion in her right shoulder was 150 degrees in flexion and 82 degrees in external rotation. Pet. Ex. 11 at 173. Normally, "passive ROM is slightly greater than active ROM

4

On June 20, 2017, petitioner reported for physical therapy reporting a pain level of 4 on a scale of 1 to 10. Pet. Ex. 11 at 175. Petitioner reported that she had not taken her pain medicine since earlier in the day. *Id.* She reported increased soreness this visit and tolerated stretching well but did not progress with exercises. *Id.*

On June 21, 2017, petitioner was seen in physical therapy. Pet. Ex. 11 at 177. Her left shoulder passive range of motion at this visit had improved to 165 degrees, compared to 155 degrees two days earlier. *Id.* at 173, 177.

On June 22, 2017, petitioner reported for physical therapy reporting pain ranging from 3-7 out of 10. Pet. Ex. 11 at 179. She reported that the pain was worse in the middle of the night and with activities such as pulling up covers and buckling her seat belt. *Id.* Her active range of motion in both shoulders was assessed. Her active range of motion in extension was 45 degrees on the left and 65 degrees on the right. *Id.* In flexion her active range of motion was 145 degrees on the left and 150 degrees on the right. *Id.* In abduction her active range of motion was 140 degrees on the left and 165 degrees on the right. *Id.* In external rotation her active range of motion was 65 degrees on the left and 82 degrees on the right. *Id.* She was assessed as demonstrating excellent progress with range of motion. *Id.* at 180.

On June 23, 2017, petitioner returned to Dr. Frisella for a post-operative examination. Pet. Ex. 2 at 33. He noted that her incisions were healed and she was doing well. *Id.* He instructed her to continue physical therapy three times a week and follow up in three to five weeks. *Id.*

On June 23, 2017, petitioner reported for physical therapy. Pet. Ex. 11 at 183. She reported pain between 3-4 out of 10. *Id.* Petitioner reported for 13 additional physical therapy sessions between June 26, 2017 and July 28, 2017. Pet. Ex. 11 at 185-227.

On June 27, 2017, petitioner reported "minimal pain levels." Pet. Ex. 11 at 188. On June 30, 2017, petitioner reported pain ranging from 1-9 out of 10 and reported that she no longer experienced pain buckling her seat belt. Pet. Ex. 11 at 191. She was assessed as having "full ROM [range of motion], except with shoulder external rotation and combined shoulder IR [internal rotation]." Pet. Ex. 11 at 192. However, she still did not meet her job requirements and required additional physical therapy. *Id.* On July 3, 2017, she reported current pain of 2 out of 10. Pet. Ex. 11 at 197.

On July 11, 2017, petitioner underwent a physical therapy re-evaluation. Pet. Ex. 11 at 209. She reported pain ranging from 1-3 out of 10. *Id.* She reported improvements with sleeping and that pain no longer disturbed her sleep. *Id.* On examination, her active range of motion in extension was 65 degrees on both the left and right. *Id.* Her active range of motion in flexion was 150 degrees on both the left and right. *Id.* Her active range of motion in abduction was 155 degrees on the left and 165 degrees on the right. *Id.* Her active range of motion in external rotation was 70

---

because each joint has a small amount of motion that is not under voluntary control." Norkin and White, MEASUREMENT OF JOINT MOTION at 8. Thus, these numbers are comparable.

degrees on the left and 82 degrees on the right.  *Id.*  It was recommended that she continue physical therapy at her physician's discretion.  *Id.*

On July 28, 2017, petitioner underwent another physical therapy re-evaluation.  Pet. Ex. 11 at 227.  She reported a current pain level of 1-2 out of 10 and stated that her shoulder felt stiff at times but her strength had improved.  *Id.*  On examination, her active range of motion in extension was 65 degrees on both the left and right.  *Id.*  Her active range of motion in flexion was 160 degrees on the left and 150 degrees on the right.  *Id.*  Her active range of motion in abduction was 155 degrees on the left and 165 degrees on the right.  *Id.*  Her active range of motion in external rotation was 75 degrees on the left and 82 degrees on the right.  *Id.*  It was recommended that she continue physical therapy at her physician's discretion.  *Id.*

On July 28, 2017, petitioner returned to Dr. Frisella reporting that she was doing extremely well.  Pet. Ex. 2 at 36.  She reported that her shoulder was "essentially back to normal."  *Id.*  He told her she could stop physical therapy and return to full-duty work.  *Id.*

On August 10, 2017, after completing a total of 19 physical therapy sessions, petitioner was discharged from physical therapy.  Pet. Ex. 11 at 233.  Her prognosis was noted as good.  *Id.* at 234.  It was noted that she would "return to full time/full duty with minimal pain levels."  *Id.*

On August 25, 2017, petitioner returned to Dr. Frisella for a follow up.  Pet. Ex. 2 at 39.  Her examination was normal and he found that she had "[f]ull symmetric range of motion in forward flexion, external rotation, and internal rotation."  *Id.*  He assessed her as having an excellent result post shoulder surgery and discharged her from treatment.  *Id.*

### III.    Affidavits

In her supplemental affidavit, petitioner averred that the pain from the September 21, 2016 flu vaccine "started shortly after the shot."  Pet. Ex. 13 at 1.  She reported that she sought treatment "[w]hen the pain, strength, and range of motion changes started to interfere with my daily life."  *Id.*  She explained that the series of cortisone injections she received from Dr. Frisella "were very painful while receiving them" and that after the lidocaine wore off from the shots, "the pain was even worse than before the shot for about 24 hours."  *Id.*  She noted that the series of three shots did improve her pain.  *Id.*

Petitioner averred that after the vaccine and until her surgery, she could not lift her left arm higher than the level of her shoulder, which resulted in her "having to learn how to get dressed, wash my hair, dry my hair, and do other daily activities differently. Things I used to take for granted, such as closing my car trunk, [were] impossible to do with my left arm."  Pet. Ex. 13 at 1-2.

She stated that her injury affected her work as a nurse in the emergency department, preventing her from hanging IV fluids.  Pet. Ex. 13 at 2.  She was unable to

6

help with transferring patients or perform repetitive motions without needing pain medication.  *Id.*  She averred that the pain caused sleep disturbances.  *Id.*

She averred that after the cortisone injections the pain became a dull ache, but that the pain later returned and was "relentless" by March 2017.  Pet. Ex. 13 at 2.  She stated that it was decided on May 18, 2017 that she would have surgery, but due to her work schedule and her doctor's schedule it could not be done until June 15, 2017.  *Id.*  During this time she remained in "extreme pain."  *Id.*  She stated that at work she could only take motrin and that she started having to miss work "because the pain was intolerable."  *Id.*  She recalled calling her doctor's office for refills on pain medication and "while on the phone, I was crying in pain asking for those medications."  *Id.* at 2-3.

She averred that she "had to work up until surgery, and as it came closer to the surgery, I could not even take Motrin because of bleeding risk. So the last 2 weeks, I had to work without even the help of even the minimal pain killers."  Pet. Ex. 13 at 3.  She stated that she "pushed extra hard in physical therapy so I could get back to the emergency department" after surgery.  *Id.*  She averred that the pain was better than before surgery but that pushing herself in physical therapy was uncomfortable.  *Id.*

She averred that the year after the surgery, her left arm "remained much weaker than my right arm from almost a year of decreased motion and use."  Pet. Ex. 13 at 3.  She started working with a personal trainer but stated that even after nine months working with the trainer, she was "still unable to lift as much with my left arm as I can with my right" and that she was "still unable to do a regular push-up" as her shoulder lacks sufficient strength to hold herself up.  *Id.*  She averred that the pain returns when it rains and beforehand.  *Id.*  Occasionally it still awakens her during the night.  *Id.*  She stated that although her surgery was successful, "this injury has changed my life for the worse and continues to affect me to this day."  *Id.*

Petitioner submitted an affidavit from her husband, Eric Nute.  Pet. Ex. 14.  He averred that immediately after the shot he noticed that she was restless when sleeping.  *Id.* at 1.  He averred that she complained of being tired and not sleeping well.  *Id.*  He stated that she started sleeping on the couch and rarely got a full night of sleep.  *Id.*  He had to help her get dressed at times, and she was unable to lift a soda bottle or get a plate off of a shelf.  *Id.*  She sometimes arrived home from a 12-hour shift in the emergency room in tears.  *Id.* at 2.  He averred that she still complains of shoulder pain fairly often and that her arm is still not 100%.  Pet. Ex. 14 at 2-3.

Petitioner submitted an affidavit from her mother, Georgia Kern.  Pet. Ex. 15.  She averred that she talks to petitioner almost every day and that petitioner started talking about her shoulder pain in early October 2016.  *Id.* at 1.  She averred that petitioner called her after all three cortisone injections and told her that she would get relief for about 2-3 hours after each shot and then "the pain would be worse than before the shot for the rest of the day."  *Id.*

### IV. The Parties' Arguments

Petitioner requests damages of $130,000.00 for pain and suffering. Petitioner's Brief in Support of Damages ("Pet. Br.") at 5 (ECF No. 40). Petitioner asserts that after a series of three cortisone injections and watchful waiting, her pain continued to worsen eight months after vaccination and was diagnosed with adhesive capsulitis. *Id.* at 7. Petitioner states that in June 2017 she underwent surgery and subsequently attended 19 physical therapy sessions. *Id.* Petitioner states that her family and work life suffered, as did her emotional health. *Id.* Petitioner notes that though she has had significant improvement following surgery, she continues to have pain with certain movements and her left arm is still weaker than her right arm. *Id.*

Petitioner asserts that the facts of this case support an award higher than that ordered in *Collado v. Sec'y of Health & Human Servs.*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses) and *Dobbins v. Sec'y of Health & Human Servs.*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses). Petitioner asserts that the extent of her treatment and duration of her injury are more severe than those in *Collado* and *Dobbins*.

Respondent proposes a pain and suffering award of no more than $100,000.00. Respondent's Brief on Damages ("Res. Br.") at 1 (ECF No. 41). Most of respondent's damages brief addresses respondent's position that the undersigned should adopt the "continuum approach" used by many special masters before this methodology was called into question in *Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 569, 590 (2013). Under this approach, the statutory maximum was reserved for those who were the most severely injured and who have or will suffer the most pain, suffering, or emotional distress. *Id.* at 583. Respondent emphasizes his position that the text of § 15(a)(4) contemplates that at least some petitioners would be awarded less than the stator maximum of $250,000.

Respondent briefly addresses the specific facts of this case and argues that an award of $100,000.00 for pain and suffering is reasonable based on petitioner's clinical course and the pain and suffering awards issued in other SIRVA cases. Respondent cites, without discussion, the decisions in *Collado* and *Knudson v. Sec'y of Health & Human Servs.*, No. 17-1004, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses).

### V. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks

compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B).  Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at \*22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress.  *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at \*9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at \*3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").  Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.  *I.D.*, 2013 WL 2448125, at \*9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at \*3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering in this case.  *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.").  And, of course, the undersigned may also rely on her own experience adjudicating similar claims.[5]  *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum.  *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap, with awards at the ceiling reserved for pain, suffering, and emotional distress extreme in intensity, duration, and cognizance.  *Id.* at 590-92.  Judge Merow described this continuum approach as "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly."  *Id.* at 589-90.  Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  *Id.* at 595.  He found that compensation for petitioner's pain,

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell.  Since that time, all SPU cases, including the majority of SIRVA claims, have remained on the undersigned's docket.

9

suffering, and emotional distress would be greater than $250,000 and thus applied the cap.

## VI. Prior SIRVA Compensation

### A. History of SIRVA Settlement and Proffer[6]

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2019, 1,170 SIRVA cases have informally resolved[7] within the Special Processing Unit since its inception in July of 2014. Of those cases, 689 resolved via the government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[8] Additionally, 462 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $75,325.00 to $124,442.25.[9] The median award is $96,223.27. Formerly, these awards were presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Since late 2017, the government's proffer has included subtotals for each type of compensation awarded.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $95,000.00.[10] The median award is $70,000.00. In most instances, the parties continue to present the stipulated award as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

---

[6] Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims website by keyword and/or by special master. On the court's main page, click on "Opinions/Orders" to access the database. All figures included in this order are derived from a review of the decisions awarding damages within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[7] Additionally, 36 claims alleging SIRVA have been dismissed within the SPU.

[8] Additionally, there have been 19 prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

[9] Typical range refers to cases between the first and third quartiles. Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00. Among the 19 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $115,772.83. For these awards, the first and third quartiles range from $90,000.00 to $160,502.39.

[10] Typical range refers to cases within the second and third quartiles. Additional outlier awards also exist. The full range of awards spans from $5,000.00 to $509,552.31. Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

### B. Prior Decisions Addressing SIRVA Damages

In addition to the extensive history of informal resolution, the undersigned has also issued 19 reasoned decisions as of the end of May of 2019 addressing the appropriate amount of compensation in prior SIRVA cases within the SPU.[11]

#### i. Below-median awards limited to past pain and suffering

In eleven prior SPU cases, the undersigned has awarded compensation for pain and suffering limited to compensation for actual or past pain and suffering that has fallen below the amount of the median proffer discussed above. These awards for actual pain and suffering ranged from $60,000.00 to $90,000.00.[12] These cases have all included injuries with a "good" prognosis, albeit in some instances with some residual pain. All of these cases had only mild to moderate limitations in range of motion and MRI imaging likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. The duration of injury ranged from six to 29 months and, on average, these petitioners experienced approximately fourteen months of pain.

Significant pain was reported in these cases for up to eight months. However, in approximately half of the cases, these petitioners subjectively rated their pain as six or

---

[11] An additional case, *Young v. Sec'y of Health & Human Servs.*, No. 15-1241V, was removed from the SPU due to the protracted nature of the damages phase of that case. In that case the undersigned awarded $100,000.00 in compensation for past pain and suffering and $2,293.15 for past unreimbursable expenses. 2019 WL 664495 (Fed. Cl. Spec. Mstr. Jan. 22, 2019). A separate reasoned ruling addressed the amount awarded. 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019).

[12] These cases are: *Bruegging v. Sec'y of Health & Human Servs.,* No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019) (awarding $90,000.00 for actual pain and suffering and $1,163.89 for actual unreimbursable expenses); *Pruett v. Sec'y of Health & Human Servs.*, No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019) (awarding $75,000.00 for actual pain and suffering and $944.63 for actual unreimbursable expenses); *Bordelon v. Sec'y of Health & Human Servs.*, No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (awarding $75,000.00 for actual pain and suffering); *Weber v. Sec'y of Health & Human Servs.*, No. 17-0399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (awarding $85,000.00 for actual pain and suffering and $1,027.83 for actual unreimbursable expenses); *Garrett v. Sec'y of Health & Human Servs.*, No. 18-0490V, 2019 WL 2462953 (Fed. Cl. Spec. Mstr. Apr. 8, 2019) (awarding $70,000.00 for actual pain and suffering); *Attig v. Sec'y of Health & Human Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); *Dirksen v. Sec'y of Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses); *Kim v. Sec'y of Health & Human Servs.*, No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Knauss v. Sec'y of Health & Human Servs.,* No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Marino v. Sec'y of Health & Human Servs.,* No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-0224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses).

below on a ten-point scale. Petitioners who reported pain in the upper end of the ten-point scale generally suffered pain at this level for three months or less. Approximately one-half were administered one to two cortisone injections. Most of these petitioners pursued physical therapy for two months or less and none had any surgery. The petitioners in *Weber* and *Garrett* attended PT for five and four months respectively, but most of the PT in *Weber* focused on conditions unrelated to the petitioner's SIRVA. Several of these cases (*Knauss*, *Marino*, *Kim*, and *Dirksen*) included a delay in seeking treatment. These delays ranged from about 42 days in *Kim* to over six months in *Marino*.

### ii. Above-median awards limited to past pain and suffering

Additionally, in five prior SPU cases, the undersigned has awarded compensation limited to past pain and suffering falling above the median proffered SIRVA award. These awards have ranged from $110,000.00 to $160,000.00.[13] Like those in the preceding group, prognosis was "good." However, as compared to those petitioners receiving a below-median award, these cases were characterized either by a longer duration of injury or by the need for surgical repair. Four out of five underwent some form of shoulder surgery while the fifth (*Cooper*) experienced two full years of pain and suffering, eight months of which were considered significant, while seeking extended conservative treatment. On the whole, MRI imaging in these cases also showed more significant findings. In four out of five cases, MRI imaging showed possible evidence of partial tearing.[14] No MRI study was performed in the *Cooper* case.

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and all experienced moderate to severe limitations in range of motion. Moreover, these petitioners tended to seek treatment of their injuries more immediately. Time to first treatment ranged from five days to 43 days. Duration of

---

[13] These cases are: *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses); *Knudson v. Sec'y of Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Cooper v. Sec'y of Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); *Dobbins v. Sec'y of Health & Human Servs.*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); *Collado v. Sec'y of Health & Human Servs.*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses).

[14] In *Reed*, MRI showed edema in the infraspinatus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head. In *Dobbins*, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glenohumeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies. In *Collado*, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus. In *Knudson*, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

physical therapy ranged from one to 24 months and three out of the five had cortisone injections.

### iii. Awards including compensation for both past and future pain and suffering

In three prior SPU SIRVA cases, the undersigned has awarded compensation for both past and future pain and suffering.[15] In two of those cases (*Hooper* and *Binette*), petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain. The *Hooper* petitioner underwent surgery while in *Binette* petitioner was deemed not a candidate for surgery following an arthrogram. Despite significant physical therapy (and surgery in *Hooper*), medical opinion indicated that their disability would be permanent. In these two cases, petitioners were awarded above-median awards for actual pain and suffering as well as awards for projected pain and suffering for the duration of their life expectancies. In the third case (*Dhanoa*), petitioner's injury was less severe than in *Hooper* or *Binette*; however, petitioner had been actively treating just prior to the case becoming ripe for decision and her medical records reflected that she was still symptomatic despite a good prognosis. The undersigned awarded an amount below-median for actual pain and suffering, but, in light of the facts and circumstances of the case, also awarded projected pain and suffering.

## VII. Appropriate Compensation in this SIRVA Case

In this case, awareness of the injury is not disputed. The record reflects that at all times petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, the undersigned analyzes principally the severity and duration of petitioner's injury.

Petitioner experienced pain starting shortly after the vaccination. Pet. Ex. 13 at 1. She sought medical attention about a month later, when the pain, strength, and range of motion changes began to interfere with her daily life. *Id.* Her doctor recommended a series of three cortisone injections which were "very painful" and after which, when the lidocaine wore off, "the pain was even worse than before the shot for about 24 hours." *Id.* At her November 15, 2016 appointment for the second injection, she reported that the first injection "made her shoulder worse" and that she "was very reluctant to consider a 2nd injection." Pet. Ex. 2 at 9. She agreed to the injection after her doctor explained that he "did not have much else to offer her." *Id.*

For the nine-month period from her vaccination, on September 21, 2016, until her

---

[15] These cases are: *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); *Binette v. Sec'y of Health & Human Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); and *Hooper v. Sec'y of Health & Human Servs.*, No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, $37,921.48 for lost wages).

13

June 15, 2017 surgery, petitioner was unable to lift her left arm higher than shoulder level. Pet. Ex. 13 at 1-2. As a result, she modified how she performed regular daily activities such as getting dressed and grooming. Her injury limited her ability to do her job and limited her functioning at home. When working as a nurse in an emergency room and in the pre-operative period, she had limited pain relief options.

After petitioner had surgery and engaged in aggressive physical therapy, her recovery was swift. While she has continued to experience intermittent pain and residual weakness, she has largely been able to resume her prior activities.

The undersigned finds that there is preponderant evidence to establish that petitioner suffered moderate to severe SIRVA symptoms for approximately nine months after vaccination, and less severe symptoms for an additional one to two months after surgery. In addition, she underwent a series of painful cortisone injections, surgery, and extensive and painful physical therapy. As in *Dobbins*, petitioner in this case was assessed with adhesive capsulitis, although the operative report in this case noted no evidence of adhesive capsulitis.

The undersigned finds that this case is most similar to *Collado* and *Dobbins*. Petitioner's injury and treatment in this case were somewhat more severe than *Collado*. The petitioner in this case experienced pain for slightly longer than the petitioner in *Collado*, and both underwent surgical repair. Petitioner in this case underwent additional, painful cortisone injections and more physical therapy than the petitioner in *Collado*.

Petitioner in this case experienced pain for a longer duration than petitioner in *Dobbins*, but the petitioner in *Dobbins* had a more severe injury and more extensive treatment. Both petitioner in this case and in *Dobbins* were noted to have suffered from adhesive capsulitis. Petitioner in this case underwent less physical therapy than the petitioner in *Dobbins*. Petitioner in this case underwent additional, painful cortisone injections than the petitioner in *Dobbins*. In addition, due to petitioner's occupation as an emergency room nurse, her pain relief options while working were limited.

The cases cited by respondent, *Collado* and *Knudson*, involved pain and suffering awards of $120,000.00 and $110,000.00, respectively. Thus, these cases do not support respondent's position that the award in this case should be no more than $100,000.00. In *Knudson*, the undersigned described petitioner's injury as "mild-to-moderate" and indicated that it continued for approximately ten months. *Knudson*, 2018 WL 6293381, at *8-9. The undersigned finds that petitioner in this case suffered an injury similar to that in *Collado*, but for a longer duration, and more severe than the injury in *Knudson* and for a similar duration of time.

In light of all of the above, and based on the record as a whole, the undersigned finds that $125,000.00 in compensation for past pain and suffering is reasonable and appropriate in this case.

### VIII.  Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **the undersigned finds that $125,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering**.[16]

Based on the record as a whole and arguments of the parties, **the undersigned awards petitioner a lump sum payment of $125,000.00 in the form of a check payable to petitioner, Cynthia Nute**.  This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[17]

**IT IS SO ORDERED.**

> **s/Nora Beth Dorsey**
> Nora Beth Dorsey
> Chief Special Master

---

[16] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required.  *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[17] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.